**Mary CARDIN, Plaintiff,**

v.

**HARTFORD LIFE & ACCIDENT INSURANCE CO., Defendant.**

No. 04–1336.

United States District Court,
C.D. Illinois,
Peoria Division.

April 14, 2005.

J. Kevin Wolfe, Peoria, IL, for Plaintiff.

Richard J. Pautler, St. Louis, MO, for Defendant.

## ORDER

McDADE, District Judge.

Mary Cardin brings this action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, against the insurer of her former employer's long-term disability benefits plan, Hartford Life & Accident Insurance Company. Hartford moves for summary judgment on the ground that its 2003 denial of benefits was neither arbitrary nor capricious.

Boyd Gaming Corporation (previously Par-A-Dice Gaming Corporation) maintains a long-term disability benefit plan for its employees. The plan is an ERISA-governed employee welfare benefit plan. 29 U.S.C. §§ 1002(1)(A), 1003(a)(1). Boyd Gaming is the plan's sponsor and its "administrator." § 1002(16). Cardin is a former employee and participant in the plan. § 1002(7). Hartford decides claims and is therefore a "fiduciary" exercising discretionary authority or responsibility over plan administration. § 1002(21)(A)(iii); *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 990 (7th Cir.2005). Cardin is suing as a participant to recover benefits due to her under the terms of her plan, to enforce her rights under the terms of the plan, or to clarify her rights to future benefits under the terms of the plan. § 1132(a)(1)(B).

Cardin's suit concerns Hartford's decision of March 18, 2003, that she no longer met the plan's/policy's definition of total disability because accidental bodily injury no longer "prevented [her] from performing the essential duties of any occupation for which [she was] qualified by education, training, or experience" as well as Hartford's August 20, 2003, rejection of her appeal.

The parties agree that the plan shields Hartford's eligibility decision from judicial

review so long as it was neither arbitrary nor capricious. *Houston v. Provident Life & Accident Ins. Co.,* 390 F.3d 990, 995 (7th Cir.2004); *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 980 (7th Cir.1999). And the parties have relied exclusively on the "administrative record" on which Hartford based its March 2003 and August 2003 benefits denials. That record reveals the following.

On June 2, 1997, Cardin injured her right knee, or aggravated an injury to her right knee. On July 16, 1997, Dr. Donald Mitzelfelt performed an arthroscopic evaluation and debridement of Cardin's right knee. Eleven days later, Cardin went to the emergency room complaining of pain in that knee, which, as it turned out, had become infected. Dr. Steven Clark performed two procedures to drain and clean the knee.

On March 26, 1998, Dr. B. Ted Maurer became involved in Cardin's treatment. Dr. Maurer referred Cardin to Great Plains Rehabilitation for a rehabilitation program. On September 15, 1998, Dr. Maurer noted that Cardin was a candidate for another arthroscopic surgery. On November 23, 1998, Dr. Maurer performed another arthroscopic surgery on Cardin's right knee. On September 14, 1999, Dr. Maurer began injecting Cardin with Synvisc in an attempt to alleviate her pain. On April 28, 2000, Dr. Maurer recommended another series of Synvisc injections. On July 19, 2000, Dr. Maurer began another series of Synvisc injections. On January 17, 2001, Dr. Maurer noted Cardin's complaints of left leg pain and his opinion was that this could be attributable to back problems. On January 16, 2002, Dr. Maurer recorded Cardin's chief complaint as being bilateral knee pain. On August 13, 2002, Dr. Maurer again agreed to administer a series of Synvisc injections

to Cardin's right knee, and he administered them on August 28, September 4, and September 11, 2002.

In Dr. Maurer's note of December 4, 2002, he related that:

[They] had given [Cardin] [a] Synvisc series for her right knee, and this has helped her greatly. Left knee is bothering her some but not a great deal. Importantly, she has lost 40 lbs. She is working out at the Y and she has quit smoking. I think these are all wonderful. Would encourage her to continue in this way. I would see her back in 3 [months] to reevaluate her right knee and her left knee.

In Dr. Maurer's attending physician's statement of January 20, 2003, he listed bilateral knee arthritis as Cardin's primary diagnosis. On February 10, 2003, Hartford decided to refer the case to a medical clinical case manager (MCCM). The MCCM was Karen Whitmore, who was a nurse. On February 25, 2003, Whitmore called Dr. Maurer's office seeking clarification of Cardin's current functional capabilities. Donna from Dr. Maurer's office called back the same day and stated that Dr. Maurer would be in the office the next day and she (Donna) would ask him to address Whitmore's request. Donna called back the next day (February 26, 2003) and relayed Dr. Maurer's opinion that Cardin could perform sedentary desk work with no other restrictions or limitations.

Rehabilitation Clinical Case Manager (RCCM) Robin Burkman prepared an employability analysis report of March 12, 2003. Burkman noted that, according to Dr. Maurer, Cardin could perform sedentary work with no restrictions or limitations. But she could not climb, balance, stoop, kneel, crouch, or crawl due to the condition of her lower extremities. Burkman also noted Cardin's education, train-

ing, and work history. Given this profile, Burkman concluded that Cardin could perform seven unskilled, sedentary production occupations. Hartford then sent Cardin a letter of March 18, 2003, in which it informed her that it had concluded that she was no longer totally disabled.

Cardin visited Dr. Maurer again on April 8, 2003. In his record of this visit, Dr. Maurer noted that x-rays of Cardin's right knee revealed "complete obliteration of the medial joint space, severe degenerative change throughout the knee, periarticular sclerosis and osteophyte formation." He noted "severe degenerative change in all three compartments" of the right knee. X-rays of the left knee revealed "mild to moderate degenerative change." Dr. Maurer stated that the "tightest" restriction he would give her would be "sitting at a computer and doing nothing else." But he thought she would have trouble sitting for eight hours a day "without using her knees in this process." He emphasized that he did not perform formal disability evaluations and he did not have knowledge of "possible other activity that she could do." But he did think Cardin was a "full disability."

Cardin's attorney wrote a letter of June 24, 2003, appealing Hartford's decision and Hartford began to take a second look at the case. In a letter of July 11, 2003, Appeal Specialist James Powell wrote Dr. Maurer to inform him that a physician from the University Disability Consortium would soon be contacting him for clarification of Cardin's medical condition and functional status. Dr. Elizabeth Roaf, the independent medical consultant, unsuccessfully attempted to contact Dr. Maurer by telephone on July 17 and July 18, 2003, and by fax on July 28. In her July 28, 2003, report Dr. Roaf summarized her review of Cardin's file and concluded that there was certainly nothing in the record

that would indicate that Cardin could not sit for four hours a day. Nor was there any significant evidence that she could not sit for eight hours a day, provided she was allowed to change positions hourly and elevate her leg as necessary.

A second employability analysis report of August 15, 2003, found six unskilled, sedentary production jobs which would allow Cardin to change positions. Hartford issued its final decision denying Cardin's claim on August 20, 2003.

■ Cardin criticizes Hartford's decision on three grounds. Her first contention is that Donna's report of Dr. Maurer's February 2003 opinion was unreliable yet Hartford heavily relied on it in arriving at its decision. This would have been a much better argument if Hartford's March 2003 decision had been its final decision. But it was not. Hartford's final decision occurred in August 2003 and it treated Dr. Maurer's more pessimistic April 2003 opinion as the position of Cardin's treating physician. Hartford's final decision focused on Dr. Maurer's more recent and arguably more reliable opinion. This was neither arbitrary nor capricious.

■ Cardin also faults Hartford for "giving up on Dr. Maurer" and for "not discussing the matter with Plaintiff's treating physician." But Hartford wrote Dr. Maurer on July 11, 2003, to inform him that a physician would be contacting him about Cardin and attached a copy of Cardin's release of information. Dr. Roaf then attempted to contact Dr. Maurer by telephone on July 17 and 18 and by fax on July 28. And Hartford waited until August 20, 2003, to arrive at its final decision. This was reasonable.

■ Cardin's final contention is that the plan only allowed for a physical examination rather than a medical records review. But the document that the parties rely on

as their source of plan terms (R. 11–29) simply provides that Hartford will evaluate a claimant's proof and reserves the right to require a physical examination on reasonable terms and at Hartford's expense. This neither forecloses the possibility of hiring a medical consultant to help evaluate a claimant's proof nor obligates Hartford to order a physical examination in every case. And Cardin fails to develop any other argument as to why a physical examination would have added so much to the medical records review as to render Hartford's decision based on a medical records review arbitrary or capricious.

IT IS THEREFORE ORDERED that Hartford's motion for summary judgment (docket no. 5) is GRANTED. CASE TERMINATED.